E5L9STRC                          Decision

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ABIGAIL STRUBEL,

4                    Plaintiff,

5              v.                           13 CV 1106 (PAE)

6    TALBOTS CLASSICS NATIONAL BANK
     AND THE TALBOTS, INC.,
7
                    Defendants.
8
     ------------------------------x
9                                          New York, N.Y.
                                           May 21, 2014
10                                         10:44 a.m.

11   Before:

12                    HON. PAUL A. ENGELMAYER

13                                              District Judge

14                         APPEARANCES

15   BRIAN L. BROMBERG
     HARLEY J. SCHNALL
16        Attorneys for Plaintiff

17   WINSTON & STRAWN
          Attorneys for Defendants
18   BY:  JONATHAN W. MILLER

19

20

21

22

23

24

25
```

```
 1                    (In open court; case called)
 2                    MR. BROMBERG:  Brian Bromberg, Bromberg Law Office,
 3        P.C. for the plaintiff on the class.  Good morning, your Honor.
 4                    THE COURT:  Good morning.
 5                    MR. SCHNALL:  Harley Schnall, the Law Office of Harley
 6        Schnall also for the plaintiff in the class.
 7                    THE COURT:  Good morning.
 8                    MR. MILLER:  Jonathan Miller from Winston & Strawn on
 9        behalf of the defendants.
10                    THE COURT:  Good morning to you.
11                    I notice for some reason the courtroom has largely
12        cleared out.  I can't imagine why.
13                    We're here for a fairness hearing regarding the
14        proposed class action settlement.  Your papers, really I'm
15        directing myself to plaintiff, were very helpful to me.  I do,
16        however, have a number of questions for you.  Why don't we do
17        this.  Let me begin by asking the plaintiffs just briefly to
18        explain big picture why this settlement ought to be approved
19        and then I'll ask you the questions I have.
20                    MR. BROMBERG:  Sure, your Honor.
21                    First of all -- I'm just looking.  We don't seem to
22        have any objectors.
23                    THE COURT:  Let me make a record.  We can cover that
24        right now.  Put on the record, please, the notice that was
25        given to potential objectors.
```

1          MR. BROMBERG:  Well, notice was sent out by postcard

2     to 159,836 class members.  926 notices were returned without a

3     forwarding address.  The claims administrator KCC, which has

4     been in the business a long time, went online and used various

5     resources to find 631 people and remailed the notices to them.

6     295 could not be located at all by KCC.  We've had a total of

7     39 opt-outs.  We also had a website set up where the long form

8     notice was available.

9          THE COURT:  What was the means by which notice of this

10    hearing though was sent?  Was it sent by regular mail?

11         MR. BROMBERG:  Yes.  By postcard, by regular mail,

12    exactly.

13         And the people were directed to the website as well

14    where they could find the long form notice.  And in addition,

15    there was an 800 number that was specified on the postcard.

16    And a number of people called the 800 number, requested the

17    long form notice.  In fact, it was 85 people who requested the

18    long form notice.

19         THE COURT:  Right.

20         In other words, all of the people who received the

21    notice were notified of the time and place of today's hearing?

22         MR. BROMBERG:  Yes.

23         THE COURT:  And the record reflects that there is

24    nobody here, correct?

25         MR. BROMBERG:  Yes.

4

1      THE COURT:  Did you receive any communications from

2  anyone indicating an intention to be here?

3      MR. BROMBERG:  No, your Honor.

4      THE COURT:  Defense, did you?

5      MR. MILLER:  No, we did not, your Honor.

6      THE COURT:  Very good.  Thank you.  Now that we've

7  taken -- gotten the notice issue out of the way tell me why the

8  settlement should be approved.

9      MR. BROMBERG:  Your Honor, we have the Grinnell

10  factors that have been adopted by the Second Circuit.  And, in

11  fact, I did a little research awhile back and every circuit has

12  adopted them in one form or another based on the Grinnell case,

13  which sets forth the nine factors that should be taken into

14  account.

15      First of all, it's big picture.  We have a settlement

16  of 595,000 going to the class, which is 59.5 percent of the

17  maximum that's recoverable.  So we've done quite well here.

18  We've got three-fifths of the maximum which is certainly a nice

19  result.

20      I wish the maximum was higher.  It was just raised

21  from 500,000 to 1 million recently.  For many, many years, I

22  believe since the '70s, it was stagnant at 500,000.  Frankly, I

23  think they should have moved it to 2 million to account for

24  inflation, but they only moved it to 1 million.

25      Now, we have the nine factors.  The first factor the

E5L9STRC                    Decision

1    complexity, expense and likely duration of the litigation.

2              THE COURT:  Let me just as to a few -- your papers --

3    my issues actually more go to the legal fee than the factors.

4    But me just ask you a couple of questions about the factors.

5    Just help me understand what the novel issue of TILA law was

6    that was presented.  I don't fully understand it.

7              MR. BROMBERG:  The issues of Truth In Lending Act were

8    set forth in paragraphs 36 through 39 of the complaint.

9    Basically they were given improper Fair Credit Billing Act

10   notices with the initial account opening disclosures.  This

11   is -- well, it's novel because it's -- no one's really

12   litigated these issues until recently.  The changes came about

13   after the 2008 financial collapse.  A number of amendments were

14   put into the Truth In Lending Act to require further

15   disclosures.  All the model forms were rewritten first by, I

16   believe it was the Federal Reserve Bank and then later by the

17   Consumer Financial Protection Bureau.  And many banks have not

18   come into compliance.  This case was basically to get -- to get

19   Talbots into compliance, to get the various -- the various

20   creditors to start complying with giving the proper notices,

21   the proper Fair Credit Billing Act notices with the initial

22   account opening.

23             So that's essentially what the case was about.

24   There's been very few reported decisions on whether or not the

25   failure to give these notices violates.  I believe we're

1   actually responsible for many decisions that are out there.

2              THE COURT:  Do you know following the filing of this

3   lawsuit, whether the lawsuit prompted or stimulated other

4   financial institutions to modify their practices to avoid the

5   problem pinpointed in your complaint.

6              MR. BROMBERG:  Well it's hard to specifically say that

7   this lawsuit brought about the change.  We know -- we've been

8   bringing a number of these lawsuits, and we do know that the

9   banks are coming into compliance now.  We know that the

10  Citibank subsidiary Department Stores National Bank has come

11  into compliance now.

12             THE COURT:  Since the filing of your lawsuit?

13             MR. BROMBERG:  Since the filing of this and a number

14  of other lawsuits.  We know that Comenity Bank, which used to

15  be known as World Financial Network National Bank has brought

16  its disclosures into compliance.  In other words, everyone is

17  now moving into compliance largely as a result of the efforts

18  we've made on these cases.

19             THE COURT:  Have you brought parallel lawsuits raising

20  the same claim against other financial institutions?

21             MR. BROMBERG:  Similar claims, yes.

22             THE COURT:  How many parallel other lawsuits have you

23  brought?

24             (Pause)

25             MR. BROMBERG:  I'd say we've brought probably about --

E5L9STRC                          Decision

I'd have to say probably six or seven of these lawsuits.  Some

of them are against the same financial institution like, for

instance, Comenity used to be World Financial Network National

Bank --

          THE COURT:  Yeah.

          MR. BROMBERG:  -- has accounts with many, many

different department stores.  So, for instance, we brought

three lawsuits against them because --

          THE COURT:  And each of them has a separate statutory

max that applies to each.  In other words, each of them has

million dollar max because it's a different course of dealing

in effect?

          MR. BROMBERG:  That's our argument.  Their argument is

that we should be limited to a total of 1 million for all three

combined.

          THE COURT:  Is this the first of these cases to be

resolved?

          MR. BROMBERG:  We've had a number of them resolved but

nothing's gone to final approval yet, I believe.

          THE COURT:  So this case may set some form of a

guidepost for some of the other cases?

          MR. BROMBERG:  Absolutely.

          I don't think any of those cases have actually gone to

final approval yet.  We've gotten motions for preliminary

approval pending on three of them right now.

E5L9STRC                        Decision

1          THE COURT:  Okay.

2          MR. BROMBERG:  We have attempted to settle two others.

3    Both against the same institution.

4          Settlement discussions on one more -- that's right --

5    settlement discussions on one more, but none of those have gone

6    to -- there's been -- none of them have had preliminary

7    approval yet.  None of them have had final approval yet.

8          THE COURT:  All right.  Tell me a little bit about the

9    nature of the informal discovery that occurred in this case

10   before settlement talks got underway.

11         MR. BROMBERG:  The primary informal discovery was

12   finding out the maximum exposure, the maximum of one million.

13   That wasn't a big issue.

14         THE COURT:  That's statutory.

15         MR. BROMBERG:  That wasn't a big issue because they

16   basically admitted the maximum.

17         Most of it had to do with finding out how many class

18   members there were.

19         THE COURT:  What work did you do before the settlement

20   talks got underway?

21         MR. BROMBERG:  Mostly preparation of the complaint,

22   research of the various issues, discussions with clients,

23   research of the law.

24         THE COURT:  Of the 117.8 hours that you did in the

25   case, how much were done before settlement discussions got

E5L9STRC                          Decision

underway, approximately?

MR. BROMBERG:  I'd have to go back over it.

THE COURT:  Ballpark?  More than half?  Less than half?

MR. BROMBERG:  I'd have to say probably about half.

THE COURT:  So, ballpark, about 60 hours of work precedes the settlement.  And about 60 hours is the process of getting the settlement in place.

MR. BROMBERG:  Yes.

THE COURT:  That includes the submission of the papers you've made to me in support of the settlement?

MR. BROMBERG:  Yes.

And honestly I'm expecting to be inundated with calls on this case once the actual checks go out.

There are two ways these settlements tend to work. One way is with a claim form class where people who submit the claim form get a check based on the number of people who submit the claim form.  There, I tend to get inundated with calls before the final approval hearing.

When you have a settlement like this where everyone is being sent a check regardless of whether they've sent in a claim form, I tend to get overwhelmed with calls after the settlement.

THE COURT:  Meaning, "What's this check for?"

MR. SCHNALL:  Exactly.

1              THE COURT:  And, "If I cash it, am I giving up some

2    right?"

3              MR. BROMBERG:  Exactly.

4              THE COURT:  How much time can you expect to spend

5    postsettlement on the phone, based on your prior experience?

6              MR. BROMBERG:  There are going to be hundreds of

7    calls.  I've had -- I'm anticipating probably a hundred calls a

8    day once those $3.73 go out I'm expecting to be inundated with

9    calls.

10             THE COURT:  So in that sense the 117.8 hours

11   understates the amount of time that will unavoidably be spent

12   dealing with the sequelae of this case?

13             MR. BROMBERG:  Yes.

14             THE COURT:  I take it yours is substantially a TILA

15   practice?  Your practice is largely in the TILA space?

16             MR. BROMBERG:  Consumer Protection Act in general.

17   Fair Credit Reporting Act.  Fair Debt Collection Practices Act.

18   Truth In Lending Act.  Equal Credit Opportunity Act.

19             THE COURT:  One of the questions I had in thinking

20   about the legal fee here is for every case that you bring that

21   bears fruit like this one, how many of them do not bear fruit?

22             In other words, I'm trying to understand -- you know,

23   you've chosen to measure the lawyers' fee essentially as

24   against the recovery, but as against the lodestar you're

25   basically asking for close to $1,700 an hour.  In other words,

E5L9STRC                         Decision

1   based on -- and I have seen other cases where it goes the other

2   way and the lodestar is more favorable and that's the argument

3   that's made.

4           One of the ways to look at this is to look outside the

5   four corners of the individual lawsuit and to say in effect:

6   You're in a risk-taking business.  You file lawsuits.  Some of

7   them fail.  Some succeed.  And the relevant unit of measure

8   ought to be not just the four corners of this suit but the

9   overall consumer protection practice that you're in.  This is a

10   helpful question.

11          So the question for you is how -- for each case that

12   you bring which hits a small jackpot like this one, do you

13   bring cases that die on the vine.

14          MR. BROMBERG:  I'd say it's 50/50.  In fact, your

15   Honor, one of the cases was in this courtroom that died on the

16   vine.  That was Litman v. Chase.  That was one of the cases

17   that died on the vine.

18          THE COURT:  What was the case?

19          MR. BROMBERG:  Litman v. Chase.  It was a case where

20   it had to do with the date of acceptance of payments.

21          THE COURT:  I remember that.

22          MR. BROMBERG:  And then it happened to overlap with

23   hurricane Sandy.  It got a little complicated.

24          THE COURT:  Yes.  Yes.  I remember that.

25          MR. BROMBERG:  Also Schwartz v. HSBC.

1          THE COURT:  I remember that well.

2          MR. BROMBERG:  Which was --

3          THE COURT:  I think it was dismissed except for one

4     claim made by the individual plaintiff that appeared to be

5     unique to her.  I believe everything but one claim.  And the

6     one claim that was left was not class cert worthy.

7          MR. BROMBERG:  Yes.  I'm sorry.  I was confusing the

8     two cases.

9          I'd say probably 50/50, the cases that die on the vine

10    versus the cases that we push through to class certification.

11         And frankly, we're two of the few attorneys who

12    actually push these cases through to class certification.

13    There are a number of attorneys primarily in the FDCPA world

14    who will file cases as class actions and settle them

15    individually, which is something that I don't believe is an

16    appropriate practice.

17         THE COURT:  Tell me a little bit more about the lead

18    plaintiff's efforts.

19         MR. BROMBERG:  Well the lead plaintiff has been very

20    much involved.  Every step of the way we've been communicating

21    with her, primarily through Mr. Schnall has been communicating

22    with her, to make sure that she's on board with the settlement,

23    to make sure that she's aware of her obligations as a class

24    representative, to make sure --

25         THE COURT:  How did she come -- I'm obviously asking

E5L9STRC                        Decision

1  the question because of the $5,000 award that is anticipated

2  for her.

3         Did you bring the case to her attention or did she

4  bring it to yours?

5         MR. BROMBERG:  She brought it to ours, your Honor.

6         THE COURT:  So she came to see you and said, in

7  effect, I'm troubled by what I'm seeing here in the form of

8  this disclosure.

9         MR. BROMBERG:  Came to Mr. Schnall with the account

10  opening disclosures and said is everything kosher here.

11         THE COURT:  The memorandum states that about

12  approximately 159,502 individuals are entitled to receive

13  settlement checks.

14         Look, I understand some of them won't cash them but

15  how come that figure is proximate and not precise?

16         MR. BROMBERG:  It was just -- I think it was just

17  leftover from earlier -- an earlier draft.

18         THE COURT:  In fact, that's the number of checks

19  you're going to cut?

20         MR. BROMBERG:  Yes.

21         THE COURT:  Tell me a little bit about the SIPRI

22  recipient to the extent checks aren't cashed.

23         MR. BROMBERG:  The SIPRI recipient.  It's the National

24  Consumer Law Center.  It is -- full disclosure.  I speak at

25  their conferences frequently.  It's the leading institution.  I

1   believe it started out as the -- I'm trying to remember the

2   name of the organization that it started out as.  Sergeant

3   Shriver -- I'd have to go back and check.  It was essentially

4   founded by legal services organizations around the country to

5   serve as an educational and research arm to assist them with

6   their efforts on behalf of consumers.  They publish treatises,

7   I think it's up to about 20, 25 treatises, that everyone in the

8   industry uses; the defense side uses, plaintiff side uses.

9   They also sponsor an annual conference on consumer rights

10  litigation.  I'd say 50 percent of it is made up of legal

11  services attorneys from around the country.  They give

12  scholarships frequently to the legal services attorneys.

13          They also give educational -- they also sponsor

14  educational presentations to the public.  They do a lot of

15  training of lawyers on how to handle these matters.

16          THE COURT:  In your experience -- the checks are

17  $3.70 -- what percentage of them are likely never to be cashed

18  and therefore the money to wind up with the SIPRI recipient?

19          MR. BROMBERG:  I'd have to say probably a third of the

20  money will end up with the SIPRI recipient.

21          THE COURT:  Is that because the dollar value is so

22  small that people don't take the checks very seriously?

23          MR. BROMBERG:  It's two things.  First of all, it's

24  the dollar amount; second when a check comes out of the blue

25  people are less likely to cash it than say the claim form

E5L9STRC                    Decision

situation.  When you send in a claim form, you actually know
you're going to get the check, you want the check, you're
anticipating -- and there you get a much higher percentage of
people who cash the checks.

       In the non-claim-form situation, like we have here,
where everyone is being sent a relatively small check,
sometimes people are afraid to cash them.  I get a lot of calls
saying is this some kind of scam because there have been a
number of scams primarily I think in the Northern District of
California.  There have been people pretending that they're
class settlements and using that as a way of getting private
information, stealing people's identities.

       THE COURT:  Let me just ask you.  The attorneys' fee
amount you say was resolved only after the class payment was
settled; is that correct?

       MR. BROMBERG:  Yes.

       THE COURT:  So, how does that happen.  In other words,
you agree on the 590 some odd thousand dollars that goes to the
class.

       MR. BROMBERG:  Right.  $595,000.

       THE COURT:  Then how does it come to pass that
$200,000 is chosen, I take it, only after you and the defense
have firmly agreed on the 595 do you then say we think 200,000
is the right number?  How does the 200 get arrived at?  It's
coming out of their pocket.

E5L9STRC                    Decision

1          MR. BROMBERG:  Essentially we said we can either go to

2     Judge Engelmayer and have him decide the fees based on a

3     contested petition or we can sit here and try to resolve the

4     number.  I don't recall exactly how we got to the 200,000.  I

5     think we may have demanded -- we may have demanded like 250,000

6     then agreed on 200,000.  I don't recall exactly how we got to

7     that number.

8          But the other option was saying, you know what, we

9     could do a contested fee position, go to Judge Engelmayer, let

10    him decide the fees rather than agreeing on an amount.  But we

11    want to --

12         THE COURT:  I'm just interested in the practice of it

13    all.  How common is it in cases like this that the class

14    payment is sorted out with finality before there is a

15    discussion that opens as to the legal fee?

16         MR. BROMBERG:  It's not common.  I believe it is the

17    preferable practice in fact.

18         THE COURT:  I have not seen it often and I tend to

19    agree with you.  I'm just curious.

20         MR. BROMBERG:  Well I was involved in the -- I was

21    involved in the drafting of the National Consumer -- excuse me,

22    it was the National Association of Consumer Advocates Class

23    Action Guidelines.  Actually now the third version has just

24    been approved, but I was involved in the second revision.

25         And one of the things we discussed there, and everyone

E5L9STRC                         Decision

was quite firm on, is that the best practice is not even to
talk about fees until after we resolve what the class is
getting.

THE COURT:  So, suppose, having agreed on the
$595,000, you then raise the issue of fees and your adversary
says look, I'm happy for you get some fee but let's be real
here.  The settlement got started right after the lawsuit was
filed.  I'll pay you your hourly rate that's going to wind up
fifty, sixty thousand dollars or something like that.  But
that's all I'll agree to.

Had that happened, I take it what happens then is the
595,000 in class settlement stays in place, but then you ask
for whatever you would want, which is going to be north of
200,000.  Your adversary asks for what I'm assuming to be the
1.0 lodestar.  And I resolve it.

Would that have been the way it would have played out
had you not reached an agreement on 200,000?

MR. BROMBERG:  That would have been the way it played
out.  We would have made a similar motion.  We probably would
have submitted a number of affidavits.  For instance, I
probably would have gotten an affidavit -- I think I refer to
Mr. Fishman in my papers.  I probably would have gotten an
affidavit from him as to what would be a reasonable rate for my
work and for Mr. Schnall's work.

THE COURT:  Thank you.

E5L9STRC                          Decision

1          Let me ask defense counsel just briefly as to that

2     last issue.

3          I note that you don't oppose the $200,000 as to fees.

4     I would -- I'm trying to free you from that constraint and ask

5     you for your objective view about the appropriateness of that

6     fee.

7          MR. MILLER:  It was a negotiated number, your Honor.

8     We could have gone the route that Mr. Bromberg suggested.  You

9     know, when you negotiate these things you consider how

10    expensive it is to litigate that issue on an all-in cost.  We

11    went back and forth on a number that we would agree to the max

12    of.  We didn't have access to his billing records or times, but

13    he had generally given us a sense of the amount of time that he

14    had put in.

15         I'm not going to back away from what we've agreed to.

16    We agreed to the settlement agreement that we would support an

17    application up to that amount.

18         THE COURT:  Is it correct that the class payment was

19    discussed and completely resolved before attorneys' fees opened

20    up as the subject of discussion.

21         MR. MILLER:  Yes, it is.  I mean the old practice used

22    to be to try to do it all at once and put it together.

23    Mr. Bromberg does take a very hardline that he doesn't think

24    that's the right way to approach it.  We understood from the

25    get-go that we would have no discussions about fees until we

E5L9STRC                          Decision

 1    had resolved the case itself, and that's the way it proceeded.

 2                THE COURT:  Very good.  I'm glad you did it that way.

 3    It seems to me that is the more appropriate approach.  So I

 4    commend you for doing it.

 5                Is there anything further you'd like to say?

 6                MR. MILLER:  Not a thing, your Honor.

 7                THE COURT:  All right.

 8                (Pause)

 9                THE COURT:  To begin with, we're here for a fairness

10    hearing regarding the proposed class action settlement in this

11    case, Strubel v. Talbots Classics National Bank, 13 CV 1106.  I

12    have had a very helpful and constructive colloquy this morning

13    with counsel, both Mr. Bromberg and Mr. Miller.  And the

14    inquiry I've had has helped me better understand the issues

15    here.  This bench opinion will be my decision as to the

16    application to approve the settlement, and the legal fees, and

17    the service award here.  I don't intend to issue a separate

18    written decision but just a bottomline order along the lines

19    that counsel have given me.  So to the extent that the analysis

20    is relevant to any of you, you can find it in the transcript,

21    if you wish to order the transcript of this proceeding.

22                To begin with, I'm going to summarize the procedural

23    background of the case.

24                On February 19, 2013, plaintiff Abigail Strubel

25    brought this class action against defendants Talbots Classics

1   National Bank and the Talbots, Inc. (I'll collectively refer to

2   them as Talbots).  Strubel alleged that the credit card

3   applications available in Talbots stores violated the Truth In

4   Lending Act (TILA), 15 U.S.C. Section 1601 et seq., in several

5   respects.  She alleged that the applications failed to fully

6   disclose the rights and obligations of consumer and lender with

7   respect to certain technical aspects of billing disputes.  She

8   also alleged that these applications mischaracterized Talbots'

9   authority to alter terms during a cardholder's first year.

10  Strubel proposed to proceed with a claim on behalf of a class

11  of similarly situated Talbots cardholders.  To be clear,

12  Talbots denied and denies the material allegations asserted in

13  the complaint.  Talbots denies liability.  Talbots denies that

14  the case, were it to have gone to the merits, was suitable for

15  class treatment.  Talbots has also represented by way of

16  background that on September 28, 2012 it entered into a series

17  of agreements with Comenity Bank and associated entities, which

18  I'll call Comenity, in which Comenity acquired all of Talbots's

19  retail credit card business.

20          Not too long after the complaint was filed, the

21  parties began to discuss settlement.  As settlement

22  conversations continued, the parties requested, and the Court

23  granted, a series of extensions and time to answer the

24  complaint.  The parties ultimately entered into a settlement

25  agreement, the terms of which I will describe in a moment, and

1  which were the subject of some colloquy today.

2        On January 22, 2014, this Court certified the

3  settlement class and preliminarily approved the proposed class

4  action settlement.  Before the Court today are plaintiff's

5  motions for final approval of three things.  One, the class

6  action settlement; two, attorneys' fees and costs; and three, a

7  service award for the lead plaintiff, Ms. Strubel.  Defendants

8  do not oppose any of these motions.

9        The parties engaged a claims administrator to provide

10  notice to the 159,836 class members.  Thirty-nine class members

11  opted out of the settlement.  None filed objections.  None came

12  to court today to object or comment on the settlement.

13        Now I'm going to briefly summarize the terms of the

14  settlement agreement.  The settlement class is defined as

15  follows, specifically reading from the agreement.  "The

16  plaintiff settlement class consists of all persons who both

17  opened a Talbots credit card account and first used said

18  Talbots credit card account during the class period, excluding

19  Strubel; any judge presiding over the action; or any person who

20  served as an officer or director of Talbots or Comenity during

21  the class period.  The class period term is defined to mean the

22  period between June 18, 2012 and up through and including

23  February 25, 2013.

24        The settlement agreement provides that the defendants

25  shall pay a total of $595,000 into a settlement fund.  In

E5L9STRC                      Decision

1    addition to this class payment, the agreement authorizes an

2    award of up to $200,000 for attorneys' fees and costs and a

3    separate service award of up to $5,000 for the lead plaintiff,

4    Ms. Strubel.  The parties negotiated the class payment before

5    they negotiated attorneys' fees or the service award.  In

6    total, therefore, under the agreement Talbots would pay

7    $800,000 to plaintiffs and their attorneys, including

8    Ms. Strubel here, a service award.  In addition to the class

9    payment, the settlement agreement contemplates that Talbots

10   will pay all notice and distribution costs.  In exchange,

11   importantly plaintiffs agree to release Talbots and Comenity

12   from liability for any claims against them.

13          In a class action under TILA, statutory damages are

14   limited to the lesser of $1 million or one percent of a

15   creditor's net worth.  In this case Talbots has represented

16   that one percent of its net worth exceeds the $1 million cap.

17   Accordingly, the class payment of $595,000 amounts to

18   59.5 percent, or close to 60 percent, of the maximum statutory

19   damages award.

20          The class initially contained 160,463 class members.

21   The claims administrator removed 627 duplicate names; the

22   notices for 295 individuals were returned as undeliverable with

23   no forwarding information; and 39 individuals opted out.  Doing

24   the math, this left some 159,502 class members who are entitled

25   to receive settlement checks.  These individuals will receive

E5L9STRC                    Decision

an equal share of the $595,000 settlement fund, in other words,

a check in each case for approximately $3.73.

I'm now going to discuss the applicable legal

standards.

As to the certification of the settlement class.

On January 22, 2014 I certified the settlement class.

I reaffirm that judgment today.  Under Rule 23(a) one or more

members of the class may sue as representative parties on

behalf of all members of the class only if I find that the

statutory prerequisites are met.  These are:  Numerosity,

commonality, typicality, and adequacy.  I find that all of

these prerequisites are met.  The class is numerous with more

than 150,000 members; liability appears to present an identical

issue for all plaintiffs; class counsel are clearly experienced

in TILA matters.

Having now found that Rule 23(a) is satisfied, I must

turn to Rule 23(b) and determine whether at least one of the

three prongs of that rule is satisfied.  Relevant here is the

predominance and superiority prong, the third prong.  It

requires, "That questions of law or fact common to class

members predominate over any questions affecting only

individual members, and that a class action is superior to

other available methods for fairly and efficiently adjudicating

the controversy."  This rule is designed as the Supreme Court

has said "to achieve economies of time, effort and expense, and

promote uniformity of decision as to persons similarly

situated."  I'm citing, of course, the Amchem decision, Amchem

Products v. Windsor, 521 U.S. 591 at 615, (1997).

      In this case liability appears to present identical

issues of law and fact as to all plaintiffs.  That is because

all plaintiffs received apparently identical disclosures from

Talbots and the issue is whether or not those disclosures

satisfy or do not satisfy the standards of TILA.  There has

about no inherently individual question that has been brought

to the Court's attention, nor does this appear to be a case

where issues such as reliance that are inherently

individualized are relevant.  Accordingly, I find that the

predominance requirement of Rule 23(b)(3) is satisfied

      As to the superiority prong of Rule 23(b)(3), it

requires that the class action be superior to other available

methods of fair and efficient adjudication.  As another judge

of this court has explained, that requirement is satisfied

where "the potential class members are both significant in

numbers and geographically dispersed," and "the interest of the

class as a whole in litigating the many common questions

substantially outweighs any interest by individual members in

bringing and prosecuting separate actions."  I'm citing Cromer

Finance LTD v. Berger, 205 F.R.D. 113, 122 (S.D.N.Y. 2001).  In

this case, as mentioned, there are more than 150,000 class

members.  Each member was not injured to a degree that would

E5L9STRC                    Decision

1    provide a sufficient incentive or indeed any meaningful

2    incentive to institute litigation on his or her own behalf.

3    Furthermore, certification for settlement purposes will allow

4    class counsel to handle the administration of the settlement in

5    a uniform and efficient manner.  Accordingly, I find that a

6    class action is the superior method of resolving these claims.

7    Therefore, having found all the prerequisites of Rule 23 to be

8    met, I certify the class for the purposes of settlement

9            Now I must discern whether the settlement is fair,

10   reasonable and adequate.  Briefly I'll comment on procedural

11   fairness

12           A presumption of fairness arises where a settlement

13   was reached after arm's length negotiations between parties

14   represented by competent counsel, citing Wal-Mart stores, Inc.

15   v. Visa U.S.A., Inc., 396 F.3d 96, at 116 (2d Cir. 2005).  Here

16   settlement discussions, as counsel have represented, were

17   conducted at arm's length.  Both parties are represented by

18   capable and experienced counsel.  Therefore, I find that the

19   settlement is entitled to the presumption of adequacy and

20   procedural fairness.

21           Turning to the more important question of substantive

22   fairness.  That inquiry is guided by the factors set forth by

23   the Second Circuit in the case of City of Detroit v. Grinnell

24   Corp., 495 F.2d 448 at 463 (2d Cir. 1974).  In assessing these

25   factors, I am mindful that, as the Second Circuit put the

E5L9STRC                     Decision

1    point, "The evaluation of a proposed settlement requires an

2    amalgam of delicate balancing, gross approximations and rough

3    justice."  That's at page 468.

4         The first factor involves the complexity, expense, and

5    likely duration of the litigation.  This factor requires me to

6    way the benefits of a potential settlement against the time and

7    expense of continued litigation.

8         Plaintiffs' counsel have represented, without

9    refutation, that this case resolves novel legal questions under

10   TILA.  It potentially could have led to moderately complex and

11   costly litigation.  At a minimum, there assuredly would have

12   been motions practice, and there might or might not have been

13   some degree of factual work to test the legal -- the factual

14   accuracy of the claim of deficient disclosures.  Had the case

15   not been resolved on the motions, we would then have had the

16   ardors of trial preparation, posttrial motions and appeals.

17   All of this would have consumed further resources and

18   potentially depleted the possibility of a recovery for

19   plaintiffs particularly insofar as lawyers would have had to be

20   paid.  This factor weighs in favor of approval, although the

21   Court, of course, recognizes that the costs foregone in a TILA

22   cases which is more likely than some class actions to be

23   resolved on the face of the disclosure and by measuring it

24   against the statutory requirements are not as costly as some

25   other types of class action litigation such as securities class

E5L9STRC                         Decision

1    actions.

2             The second factor involves the reaction of the class

3    to the settlement.  This is, according to the one of my

4    colleagues, "perhaps the most significant factor."  Citing

5    Maley v. Del Global Techs. Corp., 186 F.Supp. 2d 358 at 362

6    (S.D.N.Y. 2002).  In this case the claims administrator mailed

7    the settlement notice to the 159,836 class members with known

8    addresses.  Significantly, as of May 21 of this year actually,

9    no class members had objected.  Only 39 members, or about

10   0.2 percent, opted out.  Today nobody came to object to the

11   settlement.  This reaction is highly favorable.  It weighs

12   strongly in favor of approval

13            The next factor, the third one, looks to whether the

14   parties have conducted sufficient discovery to understand their

15   claims and intelligently negotiated settlement terms.  In this

16   case formal discovery had not yet begun.  However, there had

17   been some limited informal discovery and the nature of the

18   claims here did not really require sustained discovery in the

19   forms of depositions or e-mail reviews to really enable the

20   parties to make sense of the claims here.  It's not that type

21   of case.  Therefore, the parties were in a position to

22   determine the class size, the Talbots's net worth, and other

23   information relevant to certification and settlement.  Again,

24   extended discovery simply wasn't needed to ascertain liability.

25   Therefore, although this factor doesn't weigh heavily in favor

1    of approval it doesn't weigh against it either

2            The fourth factor involved the risks of establishing

3    liability and damages.  I have to weigh here the risk of

4    litigation against the certainty of recovery.  Plaintiffs have

5    not identified any special risk of establishing liability,

6    noting only the broad proposition that litigation is uncertain

7    and that defendants have denied liability.  As to damages,

8    though, there is at least a risk that a jury could have awarded

9    plaintiffs close to nothing.  It may be difficult, if not

10   impossible, to prove actual damages.  And there might be some

11   question about the -- whether full statutory damages would have

12   been awarded.  But in any event there would have been a real

13   possibility of no actual damages being awarded and a

14   significant offset in the form of legal fees.  This uncertainty

15   weighs in favor of approval

16           Fifth, I'm am to consider the risk of maintaining the

17   class action through a trial.  For the reasons I've given, this

18   is an appropriately certified class.  I can't say that there is

19   a substantial risk presented to the class certification or that

20   would have been presented had the case gone the distance.

21   However, I must recognize the theoretical risk that the

22   defendants would have successfully opposed class certification

23   or that some unexpected information would have emerged as the

24   case moved forward that would call into question either lead

25   plaintiff's adequacy to represent the class or the suitability

of class-wide determinations of liability.  This factor, to my

mind, is not consequential here.

The next factor, the sixth, is whether the defendant

has the ability to withstand a greater judgment.  Plaintiffs

don't identify any reason why Talbots couldn't withstand a

greater judgment.  I guess one might note that Talbots is a

brick-and-mortar retailer.  Life is short and uncertain.  And

these businesses are under some degree of pressure these days.

But, Talbots has represented that its net worth exceeds $100

million.  It appears plain to me that it could withstand a

greater judgment.  However, TILA imposes a $1 million cap on

statutory damages which is really the broader point.

Plaintiffs, in other words, could not have recovered

dramatically more here.  The recovery here is close to

60 percent of the realistic available damages.

Finally, I am to evaluate the reasonableness of the

proposed settlement considering the strength of plaintiff's

case and the relief offered.  The assessment of reasonableness

is to take into account the uncertainties of law and fact in

the case and the risks and costs inherent with proceeding with

such a lawsuit.  A risk here was that had the jury found

Talbots liable, it might award plaintiffs little in damages.

Given that risk, I find that the settlement amount here of

$595,000 is within the scope of reasonableness.

Putting all these factors together, and noting in

1   particular the absence of any counterindicating factor, I

2   conclude that the proposed settlement is both procedurally and

3   substantively fair.  Because there are no objections to

4   address, I thereby approve the proposed settlement is fair,

5   reasonable, and accurate.

6          Next I am going to turn to the question of attorneys'

7   fees and costs.  Plaintiff counsel seeks $200,000, an amount

8   agreed to by the parties.  This constitutes all-in 25 percent

9   of Talbots's total payment to plaintiffs and their counsel if

10  one includes the attorneys' fees.  This request is broadly

11  consistent with norms of class litigation in this circuit.

12  While being mindful that the number of class cases is

13  substantial and cases come in all sorts of shapes and sizes,

14  but 25 percent by its nature is within the bounds of normal

15  within the circuit.  Significantly, it is important to me and

16  impressive that attorneys' fees were negotiated here and will

17  not come from the class payment.  That to my mind affords some

18  degree of procedural regularity because it suggests that

19  defendants' agreement or nonobjection to this figure was not

20  coerced.  Defendants could have left attorneys' fees to the

21  Court, which could have decided -- settled on a fee amount

22  higher or lower.  Because the settlement by all accounts was

23  arrived at in the can before attorneys' fees were opened up,

24  defense -- the defense did not run a risk of scuttling a

25  settlement that it was satisfied with by not acceding to

1    plaintiff's fee demand.  So from a procedural point of view

2    that is significant to me in thinking about the reasonableness

3    of the fee award here.

4            Courts in this circuit, in addition to inquiring into

5    the percentage of the recovery, also utilize the so-called

6    lodestar method as a crosscheck for the reasonableness of fee

7    awards.  Here, plaintiffs' counsel represents that their

8    request of $200,000 in fees is approximately 3.2 times their

9    lodestar, lodestar here referring to fees times hours.

10   3.2 percent is a multiplier that is consistent with

11   multipliers, lodestar multipliers that courts in this

12   jurisdiction have commonly approved.  Indeed, for better or

13   worse courts in this district have often approved lodestar

14   multipliers between three and five.  The multiplier in this

15   case is, therefore, within a commonly approved range.

16           That said, I'm now going to address the six factors

17   set forth in Goldberger v. Integrated Resources, Inc., 209 F.3d

18   43 at 47 (2d Cir. 2000) in determining the reasonableness of

19   the fee award.

20           The first Goldberger factor is the time and labor

21   expended by counsel in achieving this settlement.  Class

22   counsel spent approximately 117.8 hours on this case, of which

23   counsel has estimated about 60 hours preceded settlement

24   discussions and approximately 60 hours came after those

25   discussions began.  That amount of time is not exceedingly

1   impressive on its own terms.  It might raise some questions

2   about whether or not a $200,000 fee award was merited.  Doing

3   the math, this will translate into an hourly rate of close to

4   $1,700 an hour for plaintiffs' counsel.  However, plaintiffs'

5   counsel brought certain factors to my attention to me today

6   that mitigate this concern.  One is that after 150,000 checks

7   for $3.73 are sent out, Mr. Bromberg explains he can expect to

8   be besieged by phonecalls from class members trying to make

9   sense of this check and their legal rights and obligations.

10  Given that, the 117 hours likely substantially understates the

11  amount of time in point of fact that plaintiffs' counsel will

12  need to spend on this overall case.  That in turn, in some

13  sense, reduces the lodestar potentially materially.

14          Second, from my colloquy with Mr. Bromberg, it became

15  clear that this case can be seen in a broader perspective.

16  Mr. Bromberg and Mr. Schnall are in the practice of doing

17  consumer rights litigations.  Some of those cases bear fruit.

18  Some of them do not.  It is appropriate, given the public

19  service that is inherent in such litigation, to take into

20  account the swings and misses as well as the base hits here.

21  And, therefore, if one extrapolates the prism and broadens it

22  to include lawsuits brought that did not bear fruit, the hourly

23  rate that is imputed in the successful cases in some sense

24  overstates the real hourly rate here.  Putting all of that

25  together, I regard the time and labor extended by counsel here

1    as a factor that to some degree favors the settlement here.

2            The second factor involves the magnitude and

3    complexity of the litigation.  The case involves more than 150

4    class members.  It presents at least a novel legal issue under

5    TILA.  There is some degree of magnitude and some degree of

6    complexity.  And I acknowledge that.

7            The third issue is the risk of the litigation.  There

8    is some risk that liability would not have been established.

9    There is also some risk that a jury would have pooh-poohed the

10   damages in this case.  Those factors are consistent with the

11   attorneys' fee award here.

12           The fourth factor is the quality of the

13   representation.  Counsel in this case were very capable

14   advocates.  I found the papers submitted to be quality papers

15   and helpful to me.  And I found counsel today to be responsive

16   and direct and helpful.  In addition, no class members have

17   objected to the attorneys' fees and that is some degree of

18   confirmation of the quality of counsel's performance.

19           The next factor is the requested fee in relation to

20   the settlement.  Again, a fee of one quarter of the common fund

21   is consistent with the norms of class litigation in this

22   circuit particularly in cases where the overall recovery is at

23   or less than $1 million.

24           Finally, I am to consider the public policy

25   implications of this award.  TILA is a remedial statute.  It is

1   designed to protect consumers from unfair lending practices.

2   Plaintiffs' counsel, therefore, played a role as private

3   attorneys general.  This role plays an important role in the

4   effective enforcement of these statutes.  Based on my colloquy

5   with Mr. Bromberg today, it appears possible, if not likely,

6   that this lawsuit and ones like it may stimulate greater

7   compliance by financial institutions with the particular

8   dimension of TILA at issue here.  Accordingly, it is

9   appropriate that counsel be adequately compensated for their

10  constructive efforts.

11          On balance, these factors suggest that class counsel

12  are deserving of a reasonable fee award for their initiative in

13  bringing this case and for efficiently obtaining a recovery for

14  the claims.  I find that the agreed-upon award of $200,000 is

15  fair and reasonable.  And I would note that I arrived at this

16  judgment after having put Mr. Bromberg on the firing line for a

17  number of minutes posing questions about the reasonableness of

18  the fee.  I came to the hearing today with an open mind as to

19  whether to approve the fee and I found that the answers I got

20  from Mr. Bromberg were in the main supportive of such a fee.

21          Finally, I will address class counsel's request, which

22  defense has agreed to, for a $5,000 service award for the lead

23  plaintiff, Ms. Strubel.  This award too was negotiated after

24  and will not come from the settlement fund.  In determining the

25  reasonableness of the award, I've considered a number of

 1    factors, including the time and effort expended by Ms. Strubel,

 2    the ultimate recovery and any burden sustained by Ms. Strubel.

 3    Counsel have represented that Ms. Strubel brought the

 4    disclosure to them.  That's important.  She took some

 5    initiative here.  It's also been represented to me that she met

 6    with class counsel, assisted with the case, heard from class

 7    counsel about developments in the case.  She also took the

 8    risk, for what it's worth, that had formal discovery been

 9    commenced she might have been deposed and inconvenienced.  In

10    light of these burdens, in light of the fact that the award to

11    the lead plaintiff will not deplete the settlement fund, in

12    light of the need to incent people to serve as lead plaintiff

13    and in light of fact that $5,000 is simply not that much money

14    I find that the request for $5,000 for the lead plaintiff is

15    fair and reasonable.  So I approve that too

16              Before we adjourn, counsel, beginning with the

17    plaintiffs, is there anything else the parties would like me to

18    address?

19              MR. BROMBERG:  No, your Honor.

20              THE COURT:  Anything?

21              MR. MILLER:  No, your Honor.

22              THE COURT:  Again, I thank counsel for their able

23    advocacy and for, Mr. Bromberg in particular, your helpful

24    answers to me today as well as you, Mr. Miller.  The colloquy

25    today gave me more comfort in approving the dimensions of the

E5L9STRC                          Decision

 1    settlement here.  I will issue an order shortly that embodies

 2    the rulings that I have made and incorporates by reference my

 3    analysis today from the bench.

 4              We stand adjourned.  I wish you well.

 5              (Adjourned)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25